# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| WENDY CHEEK, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:12-CV-981 |
| | ) | |
| CITY OF GREENSBORO, NC, | ) | |
| | ) | |
| Defendant. | ) | |

-----------------------------------------------

| | | |
|---|---|---|
| MICHAEL BROWNELL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:12-CV-1311 |
| | ) | |
| CITY OF GREENSBORO, NC, | ) | |
| | ) | |
| Defendant. | ) | |

-----------------------------------------------

| | | |
|---|---|---|
| BRETT DAVIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:12-CV-888 |
| | ) | |
| CITY OF GREENSBORO, NC, | ) | |
| | ) | |
| Defendant. | ) | |

-----------------------------------------------

| | | |
|---|---|---|
| DAVID MORGAN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:12-CV-1110 |
| | ) | |
| CITY OF GREENSBORO, NC, | ) | |
| | ) | |
| Defendants. | ) | |

# MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

Before the Court are cross motions for summary judgment filed in four lawsuits brought by certain firefighters and police officers against the City of Greensboro.  These cases raise issues related to compensation and benefits.  This opinion addresses claims in all four lawsuits that the City is contractually obligated to provide longevity payments to employees when they reach certain milestones and that the City can never reduce or end these payments.  Because the City made no offer to provide the plaintiffs with longevity payments for their entire careers, the Court will grant the City's motion in each lawsuit as to all claims that depend on the existence of such a contract.

## OVERVIEW

For many years, the City paid its employees, including police officers and firefighters, a base salary and, after a certain number of years of service, an annual longevity payment that was calculated as a percentage of salary.  The percentage rose every five years and thus resulted in what was essentially a series of annual pay raises or bonuses for experienced employees.

In 2010, the City froze increases in longevity payments for current employees and ended longevity payments completely for new employees.  As a result, when current employees reached their next five-year milestone, their annual longevity payment remained the same and did not increase.

In 2012, the City replaced the longevity program with a "service bonus program." Under this program, the City stopped longevity payments in favor of an optional bonus.

2

This change immediately affected employees' overtime compensation, as longevity payments had been taken into account in calculating overtime pay while service bonus payments were not. The change also had a cascading effect on retirement benefits, which are calculated as a percentage of total annual compensation, including overtime pay. If the City opts not to pay a bonus in a particular year, the financial effect will be even larger.

The plaintiffs contend that they had a contract with the City for annual longevity payments and for regular increases in these payments at certain five-year intervals for their entire careers and that the City breached this contract when it froze longevity pay in 2010 and again when it terminated the longevity program in 2012. The plaintiffs assert several other causes of action that depend on the existence of this contract.

None of the plaintiffs had or have written employment contracts with the City. The plaintiffs contend that the City offered longevity payments when it published a schedule of those payments in certain Benefits Books, that they accepted the City's offer by continuing their employment, and that they thereafter had contractual rights to longevity payments for the rest of their careers. The plaintiffs contend in the alternative that their rights in the longevity program were "vested" such that, after they reached their first five-year milestone, the City could never change the program's terms, or, in another alternative, that the City was contractually obligated to continue making longevity payments because it previously determined that longevity payments were non-discretionary under the Fair Labor Standards Act. The City contends that the longevity program was discretionary and could be changed at any time.

3

## LEGAL BACKGROUND

North Carolina law authorizes city councils to set compensation rates for city employees and to offer employee benefits. *See* N.C. Gen. Stat. § 160A-162. One such benefit, longevity pay, "is a plan under which employees receive additional wages based on [their] number of years of service." Diane M. Juffras, *Employee Benefits Law for North Carolina Local Government Employers* 27 (2009). Many cities provide longevity pay as an offered benefit, though state law does not require them to do so. *See id.* at 166.

Cities "may generally alter benefits, make them more generous or less generous, or eliminate any or all of them—just as they may give pay raises or order across-the-board salary freezes or cuts." *Id.* at 13-14; *see also Abeyounis v. Town of Wrightsville Beach*, 102 N.C. App. 341, 344, 401 S.E.2d 847, 849 (1991). However, North Carolina law "protects employees' expectations about what they are to receive in return for a day's work." Juffras, *supra*, at 14. If an employer distributes materials that promise certain benefits, "the promises are enforceable, and the employer must provide the benefits promised until it clearly informs employees of a change in the benefits offered." *See id.*; *see also White v. Hugh Chatham Mem'l Hosp., Inc.*, 97 N.C. App. 130, 131-32, 387 S.E.2d 80, 81 (1990); *Roberts v. Mays Mills, Inc.*, 184 N.C. 406, 114 S.E. 530, 533-34 (1922). Thus, when a city adds, eliminates, or changes a benefit, "the [city] must update any employee handbook or manual that describes the benefits that the [city] offers its employees, and it must be sure that each employee receives a revised copy." Juffras, *supra*, at 14. "Once the employer changes its handbook or policy and publicizes the changes to employees, the employer is no longer liable for the benefit. When employees

4

report to work, they know that their compensation for the work they do on that day and in the future no longer includes the eliminated benefit." *Id.* at 15; *cf. White*, 97 N.C. App. at 131-32, 387 S.E.2d at 81; *Brooks v. Carolina Tel. & Tel. Co.*, 56 N.C. App. 801, 804-05, 290 S.E.2d 370, 372 (1982).

Under North Carolina law, a party making a breach of contract claim must show: (1) the "existence of a valid contract and (2) breach of the terms of that contract." *One Beacon Ins. Co. v. United Mech. Corp.*, 207 N.C. App. 483, 487, 700 S.E.2d 121, 124 (2010) (citation omitted). In employment-at-will situations, North Carolina courts often use the "unilateral contract" theory to describe the contractual relationship created when an employer promises to provide benefits in its employment materials. *See, e.g.*, *White*, 97 N.C. App. at 131-32, 387 S.E.2d at 81.

"[T]he distinctive features of [a] unilateral contract are that the offeror is the master of his offer and can withdraw it at any time before it is accepted by performance, and that while the offer is still outstanding the offeree can accept it by meeting its conditions." *Id.* at 132, 387 S.E.2d at 81. In the employment benefits context, an employee accepts an employer's unilateral offer to provide benefits by entering or continuing employment. *See, e.g.*, *Leone v. Tyco Elecs. Corp.*, 407 F. App'x 749, 751 (4th Cir. 2011); *Hamilton v. Memorex Telex Corp.*, 118 N.C. App. 1, 10-11, 454 S.E.2d 278, 283 (1995); *Roberts*, 184 N.C. 406, 114 S.E. at 533-34. North Carolina courts have applied the "unilateral contract theory with respect to various types of employment benefits." *Garcia v. Frog Island Seafood, Inc.*, 644 F. Supp. 2d 696, 719 (E.D.N.C. 2009); *see also Hamilton*, 118 N.C. App. at 10-11, 454 S.E.2d at 283 (vacation benefits);

5

*White*, 97 N.C. App. at 131-32, 387 S.E.2d at 81 (disability benefits); *Brooks*, 56 N.C.

App. at 804-05, 290 S.E.2d at 372 (severance payments); *Roberts*, 184 N.C. 406, 114

S.E. at 533-34 (bonus payments).

One category of employee benefits is an exception to the general rule that

employers can reduce or eliminate benefits and does not depend on the unilateral contract

theory: An "employer may not change or eliminate benefits in which employees have

'vested.'" Juffras, *supra*, at 15; *see also Simpson v. N.C. Local Gov't Emps.' Ret. Sys.*,

88 N.C. App. 218, 223-24, 363 S.E.2d 90, 93-94 (1987); *Faulkenbury v. Teachers' &*

*State Emps.' Ret. Sys. of N.C.*, 108 N.C. App. 357, 369-71, 424 S.E.2d 420, 426-27

(1993). Generally, vested benefits are those in which the employee has agreed to

postpone payment or enjoyment to a time in the future such that the benefit becomes "a

form of deferred, rather than current, compensation." Juffras, *supra*, at 15; *see also*

*Simpson*, 88 N.C. App. at 223-24, 363 S.E.2d at 93-94. Whether longevity payments are

a vested benefit "is an open question in North Carolina." Juffras, *supra*, at 167.

## FACTS[1]

The City of Greensboro has approximately 3,000 full-time employees. (Doc. 68-7

at 10.) Only three of the City's employees—the Coliseum Director, the City Manager,

and the City Attorney—have written employment contracts. (Doc. 68-7 at 10; Doc. 78-1

at ¶ 3.) All other City employees are hired as at-will employees without any written

employment contracts. (Doc. 78-1 at ¶¶ 3-4; *see also* Doc. 68-7 at 10.) The City

---

[1] All citations to the record are to the Court's electronic docket in Case Number 1:12-CV-981. The facts stated are either undisputed or viewed in the light most favorable to the plaintiffs.

published information about its offered employment benefits, including longevity, in several ways. These included the City Personnel Manual,[2] a collection of policies implemented and updated over time; Employee Handbooks;[3] and "Benefits Books."[4]

As part of its benefits program, the City for many years paid annual longevity payments to employees who had worked at least five years. (*See, e.g.*, Doc. 78-23; Doc. 81-3 at 19; Doc. 81-5 at 6; *see also* Doc. 68-1 at 49.) The oldest document in evidence that embodies the terms of the City's longevity program is Policy E-5, which was part of the Personnel Manual and became effective January 1, 1977. (*See* Doc. 78-23; *see also* Doc. 68-7 at 35.) Policy E-5 provided that "[a]s of December 1, 1960, and thereafter as budgeted by the City Council, the City of Greensboro shall make longevity payments in accordance with this procedure." (Doc. 78-23 at 1.) Under Policy E-5, an employee became eligible for longevity payments once the employee met certain conditions,

---

[2] The City did not give employees physical copies of the Personnel Manual but made copies available to employees in various ways. (*See, e.g.*, Doc. 68-8 at 19, 24-25; Doc. 78-5 at 33; Doc. 78-6 at 34; Doc. 78-7 at 35.) A reference hard copy of the Personnel Manual was kept in each City department. (Doc. 68-8 at 19, 24-25; *see also* Doc. 78-5 at 33; Doc. 78-6 at 34; Doc. 78-7 at 35.) In some years, employees also had access to the Personnel Manual through the City's intranet. (*See* Doc. 68-8 at 19, 24-25.)

[3] Before 1997, the City provided each employee with a physical copy of the Employee Handbook. (*See* Doc. 68-7 at 27, 36; Doc. 70-18 at 2-3.) Thereafter, the information contained in the Handbooks was made available on the City's intranet. (*See* Doc. 70-18 at 2-3.) The record contains copies of Handbooks from 1987, 1994, and 1997. (*See* Docs. 78-5 to 78-7.)

[4] The City originally distributed Benefits Books annually. (*See* Doc. 82-1 at ¶ 3.) In later years, the City did not print full Benefits Books every year and instead distributed only the changes to offered benefits. (*See, e.g.*, Doc. 81-5 at 2; Doc. 78-12 at 2; Doc. 78-15 at 1; Doc. 78-16 at 1; Doc. 78-17 at 2; Doc. 78-18 at 2; Doc. 78-19 at 2.) In more recent years, the City did not print Benefits Books at all and instead made them available to employees on the City's intranet. (*E.g.*, Doc. 69-18 at 3; Doc. 82-9 at 2; *see also* Doc. 68-7 at 40; Doc. 82-1 at ¶ 4.)

7

including, *inter alia*, "complet[ing] at least five (5) years of continuous service." (Doc. 78-23 at 1.) The longevity payment started at 2.5% of annual salary for five years of service and rose to a maximum of 7.5% of annual salary for 20 or more years of service. (*See* Doc. 78-23 at 1.)

In 1993, the City adopted a number of policies, also published in the Personnel Manual, that dealt with benefits generally. Policy A-2, effective January 1993, provided that "[n]othing stated in this manual guarantees an employee any vested rights as [the City's] benefits and policies are subject to change without notification at the discretion of the City Manager." (*See* Doc. 78-20 at 1-2.) Policy E-1, effective August 1993, stated that the City offered its employees a number of benefits but that "[s]pecific benefit programs will vary from time to time and the type, level, eligibility and cost of such programs . . . are subject to change at any time at the sole discretion of the City" and that "[n]othing stated in this policy guarantees an employee any vested benefits rights." (*See* Doc. 78-22 at 1.) Finally, Policy G-1, also effective August 1993, stated that:

> The purpose of the City's compensation program is to recruit, retain, motivate and reward employees to fulfill the mission of the City in providing service to its citizens[.] . . . Some benefits offered by the City are mandated by law but most are voluntary[.] . . . Benefit program content, design and cost sharing may change over time in response to market conditions and to meet the changing needs of employees and their dependents[.]

(Doc. 78-24 at 1.) Policy G-1 also provided that "[n]othing stated in this policy guarantees an employee any vested benefits rights," that "[s]pecific voluntary benefit programs will vary over time as to the type of benefit, level of coverage, eligibility and cost sharing," and that "[s]uch programs are subject to change at any time at the sole

8

discretion of the City." (Doc. 78-24 at 1-2.) These policies remained in place in relevant part throughout the time at issue here.[5]

The City also provided information about benefits in Benefits Books that it distributed to employees each fall during the open-enrollment period for health and insurance benefits for the coming year. (*See, e.g.*, Doc. 82-1 at ¶ 3); *see also supra* note 4. These Benefits Books described many benefits available for the upcoming year, including, from time to time, the longevity program. (*See* Docs. 81-3, 81-5, 78-8 to 78-19, 69-18, 69-19.) The earliest Benefits Book in the record is the 1994 Benefits Book, which the City distributed to employees in the fall of 1993 during open enrollment for the 1994 benefits year, (*see* Doc. 81-3 at 2; Doc. 82-1 at ¶ 3); it stated that "[f]rom time to time the City may make changes in any of these benefit programs as deemed necessary to remain competitive with other area major employers." (Doc. 81-3 at 2.)

Employee Handbooks published by the City and distributed to employees also contained information on benefits. (*See* Docs. 78-5 to 78-7); *see also supra* note 3. The 1994 Employee Handbook briefly described the longevity program as an offered benefit, (*see* Doc. 78-6 at 17-18), and provided that "[t]he rules and policies set forth in this manual are subject to change without notification at the discretion of the City Manager"

---

[5] Policies in the Personnel Manual remained effective until they were "revised, rescinded, or replaced." (*See* Doc. 82-2 at ¶ 5.) While the City revised Policy G-1 in 2011, (*see* Doc. 78-25), this revision did not affect the language quoted *supra* stating that the City had discretion to change offered benefits at any time or that employees had no vested rights in offered benefits. (*Compare* Doc. 78-24 at 1-2, *with* Doc. 78-25 at 1-2.)

and that "[e]mployees are not guaranteed any vested right in said benefits."[6] (Doc. 78-6 at 2.)

Effective July 1, 1994, the City revised the terms of its longevity program, reducing the amounts of longevity payments. (*See* Doc. 81-5 at 6.) For employees hired on or after July 1, 1994, the revised terms provided that:

> After five years of continuous service, an employee will receive a payment each year at the end of the month in which he/she attains 5 years of service. The amount of that payment will be based on a percentage of the employee's annual base salary . . . . The benefit is calculated based on the employee's salary on the previous June 30:

| Length of Service | Longevity Award |
|---|---|
| 5 - 9 Years | 1.0% of annual salary |
| 10 - 14 Years | 2.0% of annual salary |
| 15 - 19 Years | 3.0% of annual salary |
| 20 - 24 Years | 4.0% of annual salary |
| 25+ Years | 5.0% of annual salary |

(Doc. 81-5 at 6.) Employees hired before July 1, 1994, continued to receive longevity payments at the rates set out in Policy E-5. (*See* Doc. 81-5 at 6; Doc. 78-23 at 1.)

The July 1994 revisions to the longevity program were published to employees in the City's 1995 Benefits Book, (*compare* Doc. 69-11 at 2, *with* Doc. 81-5 at 6), which the City distributed in the fall of 1994 as part of open enrollment for the 1995 benefits year. (*See* Doc. 81-5 at 2; Doc. 82-1 at ¶ 3.) The 1995 Benefits Book stated that "[t]o conserve

---

[6] The same language stating that the City could change offered benefits at any time and that employees had no vested rights in benefits also appeared in the 1987 and 1997 Handbooks. (*See* Doc. 78-5 at 2; Doc. 78-7 at 2.) The 1987, 1994, and 1997 Handbooks each also stated that the Handbooks only provided a summary of more detailed information in the City's Personnel Manual and encouraged employees to become familiar with both the Handbooks and the Personnel Manual. (*See* Doc. 78-5 at 3, 33; Doc. 78-6 at 4, 34; Doc. 78-7 at 4, 35.)

10

resources, [the City is] not printing the entire benefits book this year" and that employees should keep their 1995 Benefits Book with their 1994 Benefits Book "for reference." (Doc. 81-5 at 2.)

The July 1994 schedule of longevity payments remained effective until June 30, 2010, (*see, e.g.*, Doc. 68-1 at 44-45; Doc. 78-1 at ¶ 6), and was reprinted in various Benefits Books the City published during that time. (*See* Doc. 78-8 at 19-20; Doc. 78-9 at 22-23; Doc. 78-10 at 23; Doc. 78-11 at 23; Doc. 78-13 at 44-45; Doc. 78-14 at 22; Doc. 78-15 at 37; Doc. 78-16 at 38; Doc. 78-17 at 35; Doc. 78-18 at 43.) Each Benefits Book the City published during that time also stated that the City could change any offered benefits. The 1996-2006 Benefits Books stated that the "City reserves the right to make changes in any of [its] benefit programs at any time." (*See* Doc. 78-8 at 2; Doc. 78-9 at 2; Doc. 78-10 at 2; Doc. 78-11 at 2; Doc. 78-12 at 2; Doc. 78-13 at 2; Doc. 78-14 at 2.) The 2007-2010 Benefits Books stated that there could be "changes and updates" to the benefit programs and that "[a]s new benefits are offered, or existing benefits are modified," employees would receive additional pages to add to subsequent years' Books. (*See* Doc. 78-15 at 1; Doc. 78-16 at 1; Doc. 78-17 at 2; Doc. 78-18 at 2.)

Effective July 1, 2010, the City again revised the terms of its longevity program, (*see* Doc. 68-1 at 44-45; Doc. 78-1 at ¶ 6; Doc. 78-19 at 31), making the first of two changes to the program at issue here. Employees hired on or after July 1, 2010, were not eligible to receive longevity payments. (*See* Doc. 78-19 at 31.) For current employees, the City continued annual longevity payments, but stopped the five-year increases so that

longevity payments were frozen at the five-year interval employees had met as of June 30, 2010. (*See* Doc. 78-19 at 31.)

The July 2010 revisions to the longevity program were first published in the City's 2011 Benefits Book, which the City distributed to employees in the fall of 2010 during open enrollment for the 2011 benefits year. (*See* Doc. 78-19 at 2, 31; *see also* Doc. 82-1 at ¶ 3.) The 2011 Benefits Book stated that changes and updates to benefits programs could occur and that employees would receive information about those changes to add to subsequent years' Books.[7] (*See* Doc. 78-19 at 2.) The 2012 Benefits Book stated that:

> Specific voluntary benefit programs will vary over time as to the type of benefit, level of coverage, eligibility, and cost sharing. Such programs are subject to change at any time at the sole discretion of the City. This document does not imply there is a guarantee or contract of employment or benefits.

(Doc. 69-18 at 3.)

The terms of the longevity program in the 2011 Benefits Book remained effective from July 1, 2010, until June 2012, when the City replaced the longevity program with a "service bonus program," (*see* Doc. 86 at 20; Doc. 87 at 11; *see also* Doc. 72 at ¶ 8), making the second of two changes to the program at issue here. The 2013 Benefits Book did not mention longevity payments at all.[8] (*See generally* Doc. 82-9.) Under the terms

---

[7] The 2011-2012 fiscal year was the last year in which the City included longevity payments as a line item in its annual budget. (*E.g.*, Doc. 78-2 at ¶ 3.)

[8] The 2013 Benefits Book contained the same language as the 2012 Benefits Book concerning the City's right to change benefits at any time and disclaiming any contract or guarantee for any benefits. (*Compare* Doc. 82-9 at 2, *and* Doc. 69-19 at 3, *with* Doc. 69-18 at 3.)

of the service bonus program, the City retained discretion to give or not to give any annual bonus.  (*See* Doc. 68-1 at 46-47.)

## DISCUSSION

It is undisputed that the City made no express promise in any document that it would make longevity payments to every employee annually until the employee retired, quit, or was terminated.  It is also undisputed that the City made no express promise in any document that it would increase that percentage every five years until the employee retired, quit, was terminated, or reached certain caps.  Despite the absence of either such express promise or offer, the plaintiffs contend that they are entitled to continuing longevity pay because they had unilateral contracts with the City or, in the alternatives, because they had vested rights or because the City previously determined that past years' longevity payments were non-discretionary under the FLSA.

A.  Unilateral Contract

The plaintiffs contend that the City's Benefits Books constituted an offer to make longevity payments annually and to increase those payments at certain five-year milestones for their entire careers.  The plaintiffs further contend that they accepted the City's offer by entering or continuing their employment and that this created a unilateral contract that the City breached when it changed the longevity program in 2010 and 2012.

The plaintiffs rely on the undisputed facts that the longevity program was in place when each plaintiff was hired, that the City regularly published a schedule of longevity payments in Benefits Books that it distributed to employees, and that the City made longevity payments consistent with this schedule until 2010.  The plaintiffs testified that

13

they saw the City's Benefits Books during their employment, but did not review the Books each year; in the years that they did review the Books, they testified that they saw no language notifying them that the City had discretion to change or reduce the amount of longevity payments in the future. (*See, e.g.*, Doc. 72 at ¶ 3.)

In their briefs, the plaintiffs specifically rely on the 1995 Benefits Book—which was published and distributed to employees shortly after the July 1994 changes to the longevity program—that contains the schedule of longevity payments that the plaintiffs contend are contractually enforceable. (*See* Doc. 77 at 23-25; Doc. 81 at 23-25; *compare* Doc. 69-11 at 2, *with* Doc. 81-5 at 6.) It is undisputed that the 1995 Benefits Book contains no explicit language indicating that the City had discretion to change longevity payments.

While these facts are undisputed, they are not the only undisputed facts. They are not enough, in light of these other undisputed facts, to give rise to a contract that obligated the City to make longevity payments for the entirety of plaintiffs' careers.

Here, the City made a variety of statements in its Personnel Manual, Employee Handbooks, and Benefits Books that notified its employees that it could modify any benefit, including the longevity program, in its discretion. *See supra*. No plaintiff testified that these documents were not made available to them, and the evidence indicates otherwise. *See supra* and notes 2-4. To the extent the plaintiffs contend that they did not read these documents, that is of no moment. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Gaylor*, 190 N.C. App. 448, 452, 660 S.E.2d 104, 107 (2008) ("Persons

14

entering contracts . . . have a duty to read them and ordinarily are charged with knowledge of their contents." (citation omitted)).

Given these repeated disclaimers and the absence of any express promise in any document that the City would make longevity payments until any plaintiff retired, quit, or was terminated, there is insufficient evidence to support a finding that the City created an expectation that it would provide longevity payments for the plaintiffs' entire careers and that the plaintiffs entered or continued their employment in reliance on such an expectation. *See generally Roberts*, 184 N.C. 406, 114 S.E. at 533-34; *Hamilton*, 118 N.C. App. at 10-11, 454 S.E.2d at 283; *White*, 97 N.C. App. at 131-32, 387 S.E.2d at 81; *see also* Juffras, *supra*, at 13-15.

Nothing in the unilateral contract cases cited by the plaintiffs can be stretched to cover "promises" that the employer has regularly disclaimed. (*See, e.g.*, Doc. 81 at 17-20.) Rather, the cases the plaintiffs cited establish that the employer controls the terms of a unilateral offer and can change those terms as to future employment. *See, e.g.*, *White*, 97 N.C. App. at 131-32, 387 S.E.2d at 81; *Brooks*, 56 N.C. App. at 804, 290 S.E.2d at 372; *see also* Juffras, *supra*, at 13-15. As noted in *Roberts*, "enforcement of such contract[s] can work no harm to employers, for they can discontinue the practice by failing at any time to renew such offers." *Roberts*, 184 N.C. 406, 114 S.E. at 534; *see also Hamilton*, 118 N.C. App. at 11, 454 S.E.2d at 283 ("As the Supreme Court noted in *Roberts*, 'it is the employer, not the employee, who makes the offer, and who continues or discontinues it as he may find it to his interest." (quoting *Roberts*, 184 N.C. at 412, 114 S.E. at 533)); *White*, 97 N.C. App. at 132, 387 S.E.2d at 81.

15

The North Carolina Court of Appeals' discussion in *White* and *Brooks* underlines that the unilateral contract theory does not obligate employers to provide benefits forever. Contractual liability in both cases was based on the employer's failure to withdraw the unilateral offer before the employee met its conditions. *See White*, 97 N.C. App. at 131-32, 387 S.E.2d at 81; *Brooks*, 56 N.C. App. at 804-05, 290 S.E.2d at 372.

In *White*, the court emphasized that if the employer had withdrawn its offer to provide certain disability benefits before the employee met the stated condition, *i.e.*, becoming disabled, there would have been no liability under the unilateral contract theory. *See White*, 97 N.C. App. at 131-32, 387 S.E.2d at 81. The same result was reached in *Brooks*. *See Brooks*, 56 N.C. App. at 804-05, 290 S.E.2d at 372 (holding that the fact that an employer could have changed or canceled its offer to provide benefits before the employee met the stated conditions, but failed to do so, did not entitle the employer to summary judgment).

Here, unlike in *White* and *Brooks*, the City changed the terms of its unilateral offer in 2010 so that, going forward, there was no promise to increase the percentage of longevity payments. The City again changed the terms of its unilateral offer in 2012 so that, going forward, there was no promise to make longevity payments at all. The City communicated these changes to the plaintiffs in subsequent years' Benefits Books, after which no plaintiff could have reasonably entered or continued their employment in reliance on any other promise or expectation regarding longevity payments. *See, e.g.*, Juffras, *supra*, at 15 ("Once the employer changes its handbook or policy and publicizes the changes to employees, the employer is no longer liable for the benefit. When

16

employees report to work, they know that their compensation for the work they do on that day and in the future no longer includes the eliminated benefit."); *see also White*, 97 N.C. App. at 131-32, 387 S.E.2d at 81; *Brooks*, 56 N.C. App. at 804-05, 290 S.E.2d at 372.

In none of the unilateral contract cases cited by the plaintiffs did any employee contend or did the court find that by making a benefit available at some point during employment, the employer was bound to offer that benefit for the entire duration of the employee's career. (*See, e.g.*, Doc. 81 at 17-20.) Such a holding here would be inconsistent with discussions of the unilateral contract theory in, *inter alia*, *White* and *Brooks*. *See White*, 97 N.C. App. at 131-32, 387 S.E.2d at 81; *Brooks*, 56 N.C. App. at 804-05, 290 S.E.2d at 372.

The plaintiffs contend that because the 1995 Benefits Book setting forth the details of the City's July 1994 changes to the longevity program contained no express language indicating that longevity payments were discretionary in the future, the City was offering to make longevity payments for as long as the plaintiffs remained employed. (*See* Doc. 77 at 24-25; Doc. 81 at 23-24; *compare* Doc. 69-11 at 2, *with* Doc. 81-5 at 6.) Essentially, the plaintiffs ask the Court to imply this career-long promise from the absence of express discretionary language in the 1995 Benefits Book.

Nothing in the unilateral contract cases the plaintiffs cited suggests that the unilateral contract theory can be stretched to cover "implied terms." (*See, e.g.*, Doc. 81 at 17-20.) In each of those cases, the terms of the employer's offer were specific, and no plaintiff-employee attempted to supplement those terms by contending that the

17

employer's offer extended beyond the stated terms.  *See, e.g.*, *Roberts*, 184 N.C. 406, 114 S.E. at 531, 533-34; *White*, 97 N.C. App. at 131-32, 387 S.E.2d at 81.

In any event, the fact that an occasional City document did not contain an explicit disclaimer that benefits might be reduced or changed does not impose an affirmative obligation on the City to pay those benefits forever.  At best, the 1995 Benefits Book constituted the City's unilateral offer to provide certain longevity payments that year to any employee who met the conditions stated in that Book.  Any attempt by the plaintiffs to rely on the 1995 Benefits Book as the City's promise to provide longevity payments forever stretches the unilateral contract theory too far.[9]

The plaintiffs appear to make the same argument based on the alleged absence of an express disclaimer in the 2007-2011 Benefits Books that longevity payments were discretionary.  (*See* Doc. 77 at 24-25; Doc. 81 at 23-24.)  As discussed *supra*, the mere absence of such an express statement is not enough to impose an obligation on the City to make career-long longevity payments.  In any event, the plaintiffs' factual premise is not supported by any evidence.[10]  Each of the 2007-2011 Books contained language notifying

---

[9] In their brief, the plaintiffs make a similar argument based on language from the 1994 Benefits Book stating that "[f]rom time to time the City may make changes in any of these benefit programs as deemed necessary to remain competitive with other area major employers." (Doc. 81-3 at 2; *see also* Doc. 81 at 25.)  The plaintiffs contend that this language means that the City could only change benefit programs if the changes "increase[d]" offered benefits.  (*See* Doc. 81 at 25.)  The plaintiffs cite no authority for this interpretation, (*see* Doc. 81 at 25), and nothing in the unilateral contract cases the plaintiffs cited can be read to support such an interpretation. (*See, e.g.*, Doc. 81 at 17-20.)

[10] The plaintiffs rely on the testimony of Ms. Hammond, Mr. Cooper, and Mr. Waterman for the proposition that the 2007-2011 Benefits Books "contained no notice to employees that longevity pay was discretionary."  (*See* Doc. 81 at 23; Doc. 77 at 24.)  As to Mr. Waterman, the

18

employees that there could be "changes and updates" to the benefit programs. (Doc. 78-15 at 1; Doc. 78-16 at 1; Doc. 78-17 at 2; Doc. 78-18 at 2; 78-19 at 2.)

At best, each year's Benefits Book can be read as the City's promise to make a longevity payment to any eligible employee who reached an anniversary during that year and as a promise to provide an employee who hit a five-year milestone that year with a percentage increase in the longevity payment. Nothing in the Benefits Books represents a promise that the City would make longevity payments for an employee's entire career. Absent such a promise, the City breached no contract with the plaintiffs when it changed the conditions of the longevity program in 2010 and terminated it in 2012.

The Court will grant the City's motions for summary judgment as to the plaintiffs' breach of contract claims and will deny the plaintiffs' motions as to the same claims. The City is also entitled to summary judgment to the extent the plaintiffs' due process claims, Contracts Clause claims, estoppel and quasi-estoppel claims,[11] state law claims for

plaintiffs do not support this contention with a citation to the record. (*See* Doc. 81 at 8-10, 23; Doc. 77 at 13-16, 24.) While Ms. Hammond and Mr. Cooper agreed that the 2007-2011 Benefits Books did not include certain language that was included in the 2012 and 2013 Benefits Books, (*see* Doc. 68-1 at 58-60; Doc. 68-6 at 24-25), neither testified that no other language in the 2007-2011 Benefits Books allowed the City to make changes to the longevity program. (*See* Doc. 68-1 at 58-60; Doc. 68-6 at 24-25; *see also* Doc. 84-1 at ¶¶ 8-9.) As noted *supra*, those Benefits Books did contain language stating that the City could make "changes and updates" to benefits. (*See* Doc. 78-15 at 1; Doc. 78-16 at 1; Doc. 78-17 at 2; Doc. 78-18 at 2; Doc. 78-19 at 2.)

[11] In their summary judgment brief, the plaintiffs did not specifically discuss their estoppel and quasi-estoppel claims. (*See generally* Doc. 77.) In their response brief, the plaintiffs appear to contend that they are entitled to recover under both theories because a valid contract for continued longevity payments existed. (*See* Doc. 81 at 29.) To the extent that is so, the plaintiffs have failed to establish such a contract. To the extent these theories generally do not depend on the existence of a contract, *see Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 16-19, 591 S.E.2d 870, 881-82 (2004), the plaintiffs have pointed to no evidence supporting either theory.

underpayment and unlawful diversion of retirement benefits, and claims for declaratory and injunctive relief depend on the existence of a contract.

### B. Vested Rights

In the alternative, the plaintiffs rely on *Simpson* and *Faulkenbury* and contend that the terms of their employment with the City "include the [p]laintiffs' vested right to longevity benefits." (*See* Doc. 81 at 20-22.) These cases do not help the plaintiffs.

The plaintiffs in *Simpson* were former firefighters whose rights to certain retirement benefits had vested after their fifth year of employment pursuant to N.C. Gen. Stat. § 128-27(a)(1) and (c). *See Simpson*, 88 N.C. App. at 219-20 & n.2, 363 S.E.2d at 91 & n.2. They each contended that their contractual rights to the retirement benefits at issue were unconstitutionally impaired when the state legislature amended the method of calculating those benefits. *Id.* at 219-21, 363 S.E.2d at 91-92.

The North Carolina Court of Appeals held that the relationship between the employees whose rights had vested and the State's retirement system was contractual. *Id.* at 223-24, 363 S.E.2d at 93-94. This holding was based on the premise that a retiree's pension is properly characterized as "deferred compensation" and "already in effect earned, merely transubstantiated over time into a retirement allowance." *See id.* at 223, 363 S.E.2d at 93-94. The court specifically stated that "[t]he agreement to defer the compensation is the contract." *Id.* at 223-24, 363 S.E.2d at 94.

The plaintiffs in *Faulkenbury* were former state employees whose rights in certain retirement benefits had vested after their fifth year of employment pursuant to N.C. Gen. Stat. § 135-5(a)(1). *See Faulkenbury*, 108 N.C. App. at 362, 424 S.E.2d at 421-22. As in

*Simpson*, the *Faulkenbury* plaintiffs contended that a statutory change to the method of calculating their retirement benefits unconstitutionally impaired their contractual rights. *Id.* at 362-63, 424 S.E.2d at 421-22. Relying on the analysis in *Simpson*, the court held that the relationship between the plaintiffs and the State's retirement system was contractual. *See id.* at 370-72, 424 S.E.2d at 426-27; *see also Bailey v. State*, 348 N.C. 130, 141-42, 500 S.E.2d 54, 60-61 (1998).

Simpson and *Faulkenbury* are different from this case. In both *Simpson* and *Faulkenbury*, North Carolina statutes gave the plaintiffs vested rights in the benefits at issue. *See Simpson*, 88 N.C. App. at 219-20 & n.2, 363 S.E.2d at 91 & n.2; *Faulkenbury*, 108 N.C. App. at 362, 424 S.E.2d at 421-22. None of the *Simpson* or *Faulkenbury* plaintiffs made any argument that they had vested rights in the benefits for any reason other than these statutes, and neither case includes language that indicates the court considered such an argument. Here, the plaintiffs have cited no ordinance or statute that establishes their "vested right" to future longevity payments based on current service.

Central to the holding in *Simpson* was that a retirement pension is properly characterized as a form of deferred compensation. *See Simpson*, 88 N.C. App. at 223-24, 363 S.E.2d at 93-94. As the court stated, "[t]he agreement to defer the compensation is the contract." *Id.* at 223-24, 363 S.E.2d at 94. The *Faulkenbury* court adopted the same reasoning. *See Faulkenbury*, 108 N.C. App. at 370-72, 424 S.E.2d at 426-27.

Here, the plaintiffs make no argument that longevity payments should be characterized as deferred compensation, and the evidence would not support such an argument. In the years that the City offered the longevity program, its terms provided

21

that the plaintiffs would earn longevity payments on an annual basis and would receive a lump-sum longevity payment shortly thereafter,[12] and payments were only made to current employees. Several plaintiffs testified that the City included a longevity payment in their annual pay, (*see, e.g.*, Doc. 73 at ¶ 4), and attached copies of their pay stubs in support. (*See* Doc. 71-12.) Because there was no agreement to defer longevity compensation to some later date, the plaintiffs have no vested rights. *See Simpson*, 88 N.C. App. at 223-24, 363 S.E.2d at 94; *see also* Juffras, *supra*, at 15 ("Vested benefits . . . almost always provide for the payment or enjoyment of the benefit at some time in the future, typically (but not always) in retirement. This provision for payment or enjoyment of the benefit in the future makes the vested benefit a form of deferred, rather than current, compensation.").

The plaintiffs contend that longevity pay was a vested benefit because the only requirement to receive longevity payments in the Benefits Books was that the plaintiffs complete five years of service. (*See* Doc. 77 at 6-7, 26 n.7; Doc. 81 at 20-22, 27.) In support, they rely on Ms. Hammond's testimony that "the key component of a 'vested benefit' was fulfilling a certain number of years of service." (*See* Doc. 77 at 26 n.7; Doc. 81 at 27; *see also* Doc. 68-1 at 52.) This argument fails for several reasons.

---

[12] For example, under the July 1994 revisions to the longevity program, employees hired on or after July 1, 1994, received longevity payments "each year at the end of the month in which [the employee] attain[ed] 5 years of service," and employees hired before July 1, 1994, received longevity payments "each December 1st." (*See* Doc. 69-11 at 2; Doc. 81-5 at 6.)

22

First, as discussed *supra*, the terms of the Benefits Books did not obligate the City to pay and increase longevity payments for the plaintiffs' entire careers, and it logically follows that the plaintiffs cannot be "vested" in the terms of a benefits program that the City could change at any time. Second, Ms. Hammond testified that the term "vesting" applied only to medical and health benefits because those benefits are connected to a pension system that guarantees employees receive some "return for [their] service" after a certain number of years. (*See* Doc. 68-1 at 51-56.) Ms. Hammond testified that longevity payments did not fit this definition of vesting. (*See* Doc. 68-1 at 54-56.)

In sum, *Simpson* and *Faulkenbury* do not establish that the plaintiffs had vested rights in the longevity program. Because the plaintiffs had no vested rights in the longevity program, the City is also entitled to summary judgment to the extent the plaintiffs' due process claims, estoppel and quasi-estoppel claims, and claims for declaratory and injunctive relief depend on such "vesting."

C. The FLSA

Finally, in the other alternative, the plaintiffs contend that the City was contractually obligated to make longevity payments for their entire careers because the City previously determined that the way it operated the longevity program in some years meant that longevity payments were "non-discretionary" under 29 C.F.R. § 778.211(b). (*See* Doc. 77 at 25-26; Doc. 81 at 25-27.) This argument has no merit.

Nothing in 29 C.F.R. § 778.211(b) establishes a contract between the City and the plaintiffs for longevity payments or gives the plaintiffs vested rights to longevity payments. That section only provides that a "bonus" must be included in an employee's

23

regular rate of pay when calculating overtime pay unless the employer "retain[s] discretion both as to the fact of payment and as to the amount" of payment. *See* 29 C.F.R. § 778.211(b). This regulation required the City to include longevity payments in employees' regular rate of pay for overtime purposes in any year that the City budgeted longevity payments and announced to its employees that it would make longevity payments that year in documents such as the Benefits Books; in those particular years, the City lost its "discretion" to the payments under § 778.211(b). This does not mean, however, that the City was obligated to make longevity payments for as long as an employee worked for the City, particularly once the City no longer budgeted the longevity program or made reference to it in Benefits Books.

## CONCLUSION

For many years, the City distributed Benefits Books to its employees that announced the City's offer to provide long-time employees with longevity payments in exchange for their years of service. At most, these Benefits Books represented the City's unilateral offer to provide longevity payments in the year that a particular Book was published. Nothing prevented the City from changing the terms of its offer from year to year and publishing those changes in subsequent years' Benefits Books. Once the City publicized these changes to its employees, no employee could have entered or continued employment based on any other expectation regarding longevity payments. Any attempt by the plaintiffs to rely on any Benefits Book as the City's promise to provide career-long longevity payments stretches the unilateral contract theory too far and ignores disclaimers that the City made in a number of its employment materials through the years.

24

The City had no contract with the plaintiffs to provide career-long longevity payments and breached no contract with the plaintiffs when it changed the longevity program. The City is entitled to summary judgment on all claims that depend on the existence of such a contract.

The Court will enter judgment as time permits and as is otherwise appropriate. This the 15th day of July, 2015.

UNITED STATES DISTRICT JUDGE